**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| FOUR S SHELL LIMITED LIABILITY COMPANY,<br><br>*Plaintiff,*<br><br>v.<br><br>PMG LIMITED LIABILITY COMPANY,<br><br>*Defendant.* | Civil Action No.: 16-cv-5701 (PGS)(TJB)<br><br>**MEMORANDUM** |

This trial arises out of the non-renewal or termination of a dealer (Plaintiff Four S Shell Limited Liability Company ("Four S Shell")) from a franchise to operate a gasoline station owned by Defendant PMG New Jersey, LLC ("PMG"), which is a motor fuel distributor. Four S Shell's sole claim was brought under the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801, *et seq.*[1] A three-day bench trial was conducted. The Court has subject matter jurisdiction over this action pursuant to PMPA.

In this action, Four S Shell alleges that PMG failed to renew and/or terminate a franchise agreement in good faith and in the normal course of business, contrary to § 2802(b) of PMPA. Under § 2802(b)(3), a gas station franchisor (PMG) may amend, non-renew, or terminate a franchise agreement with a franchisee (Four S Shell) as long as it does so in good faith and in the normal course of business. *Id.* § 2802(b)(3)(A)(i).

---

[1] The parties do not dispute that PMPA applies. Moreover, the Dealer Lease and Supply agreement dated September 30, 2013 provides that "each party . . . reserves all rights under [PMPA];" and defendant acknowledged that "the only remaining issue is PMG's subjective good faith." (Joint Ex. 1 ¶ 26, ECF No. 88 at 2282).

In an action under PMPA, a burden-shifting framework applies.  Initially, a dealer (franchisee) must prove that it was terminated or non-renewed by the franchise owner (franchisor) and, if a dealer so proves, then the franchisor must show it complied with Sections 2802(b) or 2803 of PMPA.[2]  The statute provides that:

> In any action under subsection (a), the franchisee shall have the burden of proving the termination of the franchise or the nonrenewal of the franchise relationship.  The franchisor shall bear the burden of going forward with evidence to establish as an affirmative defense that such termination or nonrenewal was permitted under section 2802(b) or 2803 of this title, and, if applicable, that such franchisor complied with the requirements of section 2802(d) of the title.

*Id.* § 2805(c); *see also Glenside W. Corp. v. Exxon Co., U.S.A.* 761 F. Supp. 1100, 1109 (D.N.J. 1991); *Duff v. Marathon Petroleum Co.*, 51 F. 3d 741, 744 (7th Cir. 1995).

At a bench trial, the Court has three roles.  First, as trier of fact, the Court's duty is to decide the facts from the evidence that was presented during the trial, and to assess the credibility of the witnesses.  The second duty is to apply the law to the facts.  Lastly, the Court must clearly explain the facts and the legal principles underpinning its decision.  Like a jury, the Court performed these duties fairly and impartially.  It considered all of the evidence presented and used common sense, in light of everyday experience with people and events.  As such, the Court gave the evidence whatever weight it believed it deserved.  *See* Third Circuit Model Jury Charge 1.5.

The crux of this case revolves around the non-renewal of a franchise agreement to operate a gas station.  Four S Shell contends that PMG's proposal to increase rent eighty-three percent (*i.e.*, from \$5,466.67 to \$10,000 per month) in order to renew the franchise agreement

---

[2] In the testimony, the witnesses referred to PMG as the distributor and Four S Shell as the dealer; however, the PMPA refers to the distributor as franchisor and dealer as franchisee.  Herein, both references are utilized.

was a bad faith effort to terminate or non-renew Four S Shell from the gas station, in violation of PMPA. PMG disagrees and argues that the proposed rent was offered in good faith and calculated in the ordinary course of business by determining the rent through PMG's guideline rent formula. In sum, this case boils down to one question: did PMG offer to renew Four S Shell's franchise agreement in good faith and in the ordinary course of business? As noted above, Four S Shell must prove its agreement was terminated or non-renewed by PMG, and PMG bears the burden of demonstrating that its rent increase proposal was made in good faith and in the ordinary course of business. 15 U.S.C. § 2805(c); *see also Coast Vill., Inc. v. Equilon Enters.,* 163 F. Supp. 2d 1136, 1176 (C.D. Cal. 2001), aff'd, 64 F. App'x 36 (9th Cir. 2003); *Ferriola v. Gulf Oil Corp.*, 496 F. Supp. 158, 162 (E.D. Pa. 1980), aff'd, 649 F.2d 859 (3d Cir. 1981). With this background, the findings of fact and conclusions of law follow. Fed. R. Civ. P. 52.

## FINDINGS OF FACT

Three witnesses testified: James Deakin, Vice President of Business of PMG; Steve McGee, a former District Development Manager ("DDM") of PMG; and Shilpa Sathu, sole owner of Four S Shell. In addition, a number of exhibits and stipulations were admitted into evidence.

PMG and Four S Shell were subject to a Dealer Lease and Supply Agreement dated September 30, 2013 (Joint Ex. 1)[3] for a gas station (designated within the Supply Agreement as Station 9538) located at the intersection of Route 1 South and Finnegan's Lane in South Brunswick, New Jersey (hereinafter, "Station 9538" or "Station"). That site is in a high traffic

---

[3] "Joint Ex." refers to the parties' Joint Trial Exhibits.

3

area between New Brunswick and Princeton, New Jersey.  Route 1 is a major roadway that
connects the metropolitan areas of New York City, Newark and Philadelphia.

Four S Shell is a New Jersey limited liability company.  (Stipulations of Fact ("Stip.") ¶
1, ECF No. 87; Bench Trial Transcript ("T.") 367:3-6).  Shilpa Sathu is Four S Shell's owner and
sole member.  (Stip. ¶ 3).  Sathu is highly educated – she earned a bachelor's degree in electrical
engineering and a postgraduate degree in information technology at an educational institution in
India.  (T. 367:17-21).  Prior to her interest in Four S Shell, Sathu was employed part-time at a
New Jersey law firm in an administrative capacity.  (T. 367:22-368:13).  When Sathu acquired
Station 9538, she had no experience managing and operating a gas station.  (See id.).  After her
franchise agreement was non-renewed or terminated, she became employed as a business analyst
at Head First in New York City.  (T. 366:22-25).

PMG is a Virginia limited liability company with its principal place of business located in
Woodbridge, Virginia.  (Stip. ¶ 4).  PMG distributes branded motor fuels to fuel service stations
for retail sale.[4]  (Id. ¶ 5).  Some of the stations to which PMG distributes fuels are operated as
franchises, with PMG serving as the franchisor and a station operator serving as the franchisee.
(Id. ¶ 6).  Overall, PMG conducts business at sites from Florida to Maine; it operates seventy-
eight fuel stations in New Jersey and supplies fuel to an additional ninety-eight stations within
the state.  (Id. ¶¶ 7, 8).

### HISTORY OF STATION 9538

In 2011, PMG purchased approximately forty to fifty gas stations from Shell Oil,
including Station 9538.  (Id. ¶¶ 11, 128; T. 62:12-23, T. 63:5-9).  Because Station 9538 was

---

[4] Although this was a stipulated fact, at trial PMG employee James Deakin disagreed with the characterization of
PMG's business as solely a distributor of branded motor fuel.  He viewed PMG as "a real estate company first[,]"
but "[m]ost of our real estate is tied up in asset . . . we're in real estate business and we manage real estate to the best
of our ability . . . ."  (T. 186:1-16).

purchased as part of a larger transaction involving numerous gas stations, PMG and Shell agreed to an overall price for all of the stations. Deakin testified that Shell allowed PMG to allocate a portion of the total price to each station. (T. 62:18-23, T. 73:6-14, T. 74:16-20). Consequently, the consideration set forth in the deed from Shell to PMG for Station 9538 was $805,000 but, according to Deakin, that is not the property's true value. (T. 73:2-20).

Following the 2011 transaction with Shell, PMG leased approximately ten to twelve of the stations to Waseem Chaudhary, including Station 9538. (Stip. ¶ 11). Chaudhary operated Station 9538 so poorly that the Station's value was "quickly destroyed." (*Id.* ¶ 12). Under Chaudhary's leadership, Station 9538 was "in distress," or, in other words, "performing substandard . . . horribly." (T. 28:3-15, T. 31:22-25). Specifically, Deakin testified that Chaudhary was not "selling very much gas [and] not selling very much in the store"; not operating the appropriate hours; not competitively pricing gasoline; not keeping Station [9538] in good, clean condition; and not promoting sales." (T. 28:16-14; *see also* Stip. ¶¶ 12-13). Although Station 9538 had sold approximately 200,000 gallons of fuel per month before Shell sold it to PMG, its volume decreased to approximately 20,000 to 30,000 gallons per month during Chaudhary's tenure. (Stip. ¶ 13; *see also* T. 32:7-17). Chaudhary was "encouraged" by PMG to leave Station 9538 in 2013. (T. 63:19-23).

Upon Chaudhary's departure, PMG and Karanjit Singh entered into a multi-station agreement. Under that agreement, Singh agreed to operate several of the stations previously operated by Chaudhary, including Station 9538, at a discounted monthly rent because of Chaudhary's poor performance. (*See* Stip. ¶ 15; T. 28:3-24). That is, PMG recognized that it was unable to charge Singh its guideline rent formula based upon a twelve percent return on the

fair market value of Station 9538 because the business had become so distressed. (*See id.* ¶ 14).

Indeed, McGee testified that PMG's guideline rent formula was set aside:

> Q.     Is it fair to say that the 12 percent figure that's normally used by PMG was not used on the North Brunswick [Station 9538] site?
>
> *  *  *
>
> A.     That would be correct . . . [s]o, it was . . . five or six sites; those were—those sites were distressed sites, and so they came to an agreement that's what was put into place. So, the 12 percent— was not relevant.

(T. 240:9-25).

As a result, in the Dealer Lease and Supply Agreement between PMG and North Brunswick Fuel, LLC (Singh's company), the rent for Station 9538 ranged from $4,000 per month to $4,245.00 per month over a three-year term. (Joint Ex. 1, ¶ 3(a); *see also* T. 20:12-21:4, T. 23:19-24:7). The monthly rent amounts provided in the Dealer Lease and Supply Agreement were set "artificially low" as a result of Chaudhary's performance, which had destroyed the value of the Station 9538. (Stip. ¶ 49).

Moreover, when Singh agreed to operate several of the "underperforming" sites, PMG agreed to accept a "lump sum of rent" for all of the sites leased to Singh. (*See* T. 27:14-29:3, T. 62:1-11, T. 64:9-20; T. 237:9-15, T. 240:21-25). As a result, the monthly rent amounts provided in the Dealer Lease and Supply Agreement reflected a portion of the "lump sum of rent" that PMG and Singh agreed to allocate to Station 9538. (*See id.* at 27:12-29:2, 62:1-11, 64:9-19).

On or about May 30, 2014, Singh assigned the Dealer Lease and Supply Agreement to AA Shell Gas Station, LLC (hereinafter, "AA Shell"), owned by Antonio Arvelo. (Joint Ex. 2; T. 29:20-30:8; Stip. ¶ 42). This assignment did not change any of the terms (*i.e.*, rent) provided in the Dealer Lease and Supply Agreement. (*See* Joint Ex. 2; T. 386:17-25).

6

On or about February 2, 2015 (about 7 months later), Arvelo, recognizing that he was not generating sufficient revenue, assigned all of his rights and obligations in Station 9538 to Four S Shell. (Joint Ex. 7; Stip. ¶ 43; T. 31:1-8). As part of the assignment, Four S Shell agreed to pay AA Shell a $130,000 "goodwill" payment." (Stip. ¶ 44; T. 379:11-13, T. 385:21-25). That amount consisted of $120,000 that AA Shell claimed it paid to acquire its interest in Station 9538, plus an additional $10,000 to account for the recent installation of "three in one" diesel pumps at Station 9538. (*Id.* ¶ 46). Four S Shell did not pay any consideration to PMG as part of its assumption of AA Shell's interest. (*Id.* ¶ 45; T. 144:21-23).

### FOUR S SHELL'S ACQUISITION OF AA SHELL'S (ARVELLO'S) INTEREST IN STATION 9538

Before Four S Shell assumed the Dealer Lease and Supply Agreement by assignment, Sathu knew that AA Shell was seeking to assign its interest, after only eight months of operation, because it was "not making enough money." (T. 224:1-3, T. 371:6-10). After performing her own research on the viability of the investment, Sathu, on behalf of Four S Shell, forwarded an intent to purchase AA Shell's interest in Station 9538. (T. 372:6-15).

After the intent to acquire Station 9538 was signed, Sathu first met with Steve McGee of PMG – the District Development Manager ("DDM") at that time – in or around November 2014. (T. 372:22-373:1). At that meeting, McGee "made it very clear" to Sathu that Station 9538 "was a very tough site, not an easy site; good location, busy highway, but it was a tough site," because it was in a highly competitive area. (T. 225:23, T. 226:4, T. 227:1-2, T. 373:25-373:6).

When Sathu expressed a desire to move forward with the franchise, McGee requested that she devise a business plan for PMG Vice President James Deakin's review. (T. 226:5-12, T. 377:4-8). Sathu's business plan forecasted sales growth of approximately $2 million in her first and second years of operation. (Joint Ex. 5, at 2). Sathu attributed the growth in sales to the

7

"revenues from diesel operations," as "the [S]tation [did] not have the provision for diesel, but this [was] in the process of being added." (T. 39:5-11). In particular, PMG was in the process of installing "three-plus-one" diesel pumps at Station 9538. (T. 39:12-16). A three-plus-one pump has an integrated dispenser with two hoses: one hose for diesel fuel and one hose for the three grades of gasoline (*i.e.*, regular, plus, and premium grades). (T. 29:17-23, T. 281:13-22). The new three-plus-one pumps were installed in January 2015 – the month before Four S Shell took over Station 9538. (T. 382:24-383:4).

According to McGee, Sathu's diesel sales projections were "very speculative . . . because diesel was not there before," and she had "no way of knowing if her forecast was realistic." (T. 389:20-390:13, T. 498:18-499:2). When Deakin reviewed Sathu's business plan, his impression was "that business plan, particularly around the diesel [sales], was unrealistic; if I can say absurd, just not—not realistic whatsoever." (T. 41:24-42:9; Stip. ¶¶ 25, 26). Deakin and McGee thought that Sathu would not sell 30,000 gallons per month of diesel fuel as her business plan forecasted. McGee testified:

> [M]y first impression was it was a little on the high side, but then again it was a station that had no diesel in prior—prior years, and it was on a very major corridor; so, doable, but, you know, it's going to take work.

(T. 229:21-24). Similarly, Deakin acknowledged that "it was not a realistic plan for [her to sell] 30,000 gallons per month of diesel on a site like that. That was almost fourfold what our average station sells in diesel, so it wasn't realistic." (T. 43:1-4, T. 44:13-45:14; *see also* Stip. ¶ 28). In an internal email from Deakin to McGee dated December 18, 2014, Deakin indicated that Sathu's business plan "hinges on 30k/mo diesel and store sales increases. Not likely." (Joint Ex. 8; T. 43:22-44:12, T. 229:25-230:10; Stip. ¶ 27). Contrary to PMG's representative's testimony, Sathu testified that Deakin and McGee never expressed that her diesel sale projections were an

unrealistic goal, but, rather, indicated to her "that the sales were" not going to happen overnight, but it is doable . . . it's something that is tough, but not impossible to achieve." (T. 384:15-20).

Thereafter, Deakin and McGee conducted a Skype meeting and advised Sathu that $130,000 was an excessive amount to pay for Station 9538 because it was not profitable and was losing money. (T. 143:24-144:20; Stip. ¶¶ 31, 32). Deakin warned Sathu that making the $130,000 payment would be "a horrible decision" and "also mentioned to her that for the same amount of money she could acquire two other businesses that were profitable, instead of one business that was losing money." (T. 144:4-20). Similarly, McGee advised Sathu that she was "spending $130,000 for a business that's losing money, I wouldn't buy it for zero if it were me." (T. 185:15-25). Both Deakin and McGee counseled Sathu that undertaking the operation of Station 9538 was a "huge risk" and both advised her to rescind her offer. (Stip. ¶¶ 33, 34; *see also* T. 185:15-25).

At trial, Sathu recalled that McGee's advice was different than what he stated at trial. (T. 375:11-375:4, T. 479:13-480:2, T. 490:14-23). According to Sathu, McGee stated the purchase price of $130,000 was "not such a huge number that I wouldn't be able to make this up within . . . a couple of years." (T. 374:22-375:4). Sathu furthered testified that Deakin and McGee never stated to her that Station 9538 was worth little or nothing. (T. 375:14-20). Sathu also explained that there was no writing of any kind from Deakin or McGee to her about their alleged apprehension. (T. 375:18-20). Sathu's foregoing testimony was contrary to the Stipulations of Fact admitted into evidence at the start of trial. (*See* Stip. ¶¶ 31-34; *see also* T. 490:19-23).

Notwithstanding Deakin's and McGee's alleged concerns, PMG accepted and signed the Assignment from AA Shell to Four S Shell. As such, the parties (PMG and Four S Shell) were

subject to the Dealer Lease and Supply Agreement dated September 30, 2013 ("Agreement" or "Franchise Agreement"). (Joint Ex. 1).

## THE DEALER LEASE AND SUPPLY AGREEMENT

The Dealer Lease and Supply Agreement is the operative contract between Four S Shell and PMG that governs the terms of their franchisor-franchisee relationship. (*Id.*). The Agreement was assigned to Four S Shell by AA Shell and PMG consented thereto by its approval dated February 9, 2015. (Joint Ex. 9). The essential terms of the Agreement are:

(1)     The term was three years, ending on September 30, 2016, (Joint Ex. 1, ¶1(a));

(2)     Rent ranged from $4,000 to $4,245 over the term, (*id.* ¶ 3), which, as discussed below, was increased by an Amendment to the Agreement executed by the parties on the first day of Four S Shell's operation of the Station;

(3)     The dealer must purchase and receive at least 893,000 gallons of gasoline per annum, (*id.* ¶ 6);

(4)     If requested by PMG, Four S Shell must attend and successfully complete all components of PMG's training modules prior to commencing business operations, and Four S Shell must provide sufficiently trained and qualified employees to operate the Station, (*id.* ¶ 13);

(5)     PMG reserved the right to terminate or non-renew the Agreement if any of the following occurred, (*id.* ¶ 20):

- a breach by Four S Shell of the Agreement;
- an abandonment of the Station;
- a conviction of a felony involving moral turpitude;
- fraudulent activity;
- Four S Shell's failure to pay PMG amounts due;
- death;
- mental and physical disorder;
- failure to "devote dealer's personal attention to the premises";
- destruction of the Station;
- failure of Four S Shell to exert good faith efforts to carry out the provisions of the Agreement;
- condemnation; and
- failure of Four S Shell to comply with any law or regulation relevant to the operations of the Station;

10

(6)     If any of the above occurs, PMG reserved the right to terminate or non-renew the Agreement upon 90 days' notice.  Moreover, Four S Shell had "an affirmative duty to take action to avoid the event which justifies PMG's exercise of a right of termination or non-renewal," (*id.* ¶ 21);

(7)     Upon expiration, Four S Shell was required to peacefully surrender and deliver possession to PMG, (*id.* ¶ 32); and

(8)     Maintenance and repairs obligations were allocated between Four Shell and PMG pursuant to a rider annexed to the Agreement.

Upon assignment to Four S Shell, on February 9, 2015, PMG and Four S Shell immediately entered into an Amendment to the Dealer Lease and Supply Agreement ("Amendment").  (Joint Ex. 9).  That Amendment provided a new rent schedule.  (*Id.*). Specifically, the monthly rent was increased to $3,384.29 for the month of February 2015; $4,120 per month from March through May 2015; $5,241.67 per month from June through September 2015; and $5,466,65 per month from October through September 2016.  (Joint Ex. 9; T. 396:2-11).

## FOUR S SHELL'S OPERATION OF STATION 9538

Although Sathu, as the key employee of Four S Shell, had no prior experience in operating a gas station, Sathu improved the performance of Station 9538 compared to her predecessors.  For example, while AA Shell sold approximately 75,000 gallons of gasoline per month, Four S Shell sold approximately 80,000 to 90,000 gallons of gasoline per month.  (T. 35:8-18, T. 83:7-84:14).

Moreover, the cleanliness and appearance of Station 9538 improved, as well as the customer service.  For example, Shell had a quality assurance program called the Mystery Motorist Program that evaluated customer service performance of Four S Shell's employees at Station 9538.  Under that program, Shell assigned unidentified inspectors to visit and evaluate the Station's image and customer service.  (T. 56:3-12).  The evaluating inspectors graded Four S

Shell's performance significantly higher than AA Shell. (T. 58:1-61:3). In short, overall, Sathu was more successful in operating Station 9538 than Arvelo, Singh, or Chaudhary.

### OPERATIONAL DISPUTES BETWEEN PMG AND FOUR S SHELL

Within the first few months of commencing operations, issues arose concerning the ordering of and payment for gasoline to be delivered by PMG to Station 9538. (T. 302:23-303:2). For example, beginning in August 2015, PMG required Four S Shell to pre-pay for gasoline because the balance of Four S Shell's credit card sales of gasoline was insufficient to cover the cost of the gasoline. (T. 417:12-14, T. 418:6-8). Pursuant to the Dealer Lease and Supply Agreement, credits and sales are processed through PMG's system such that the funds are escrowed and debited against gasoline purchases. When the balance of credit card sales was insufficient to cover the cost of gasoline, Sathu was required to deposit funds into an account from which PMG could cover the cost of gasoline. Between February 23 and August 31, 2015, fourteen drafts of Four S Shell's account, in the total amount of approximately $300,000, were returned for insufficient funds. (Stip. ¶ 97; Joint Ex. 19; T. 315:21-317:8). As a result, PMG mandated that Four S Shell prepay in order to be supplied gasoline for Station 9538. The amount and manner of the prepayment of gasoline was determined by PMG. (Stip. ¶ 77; T. 312:2-312:9). In order to deliver gasoline in a timely manner, the pre-payment must be deposited in the early afternoon for delivery to occur the next day. (Joint Ex. 17; *see also* T. 417:15-22). The prepayment terms resulted in an unwieldy situation, causing aggravation about the proper timing and delivery of gasoline. (*See* T. 113:1-114:1, T. 418:15-420:2). At one time, Deakin characterized Sathu as "crazy" (Joint Ex. 88), and blocked her emails, saying that she had become harassing, (T. 119:14-121:18, T. 435:21-436:5, T. 522:3-4; *see also* Joint Ex. 53). Sathu argued that the midday timing of the prepayment was unreasonable because it did not allow her

12

sufficient time to deposit the required funds into the bank. (T. 424:15-425:4). After a few months, the matter was resolved: Four S Shell deposited $25,000 into an account controlled by PMG and, with that amount in escrow, the regular ordering and delivery of gasoline resumed. (T. 427:11-15, T. 441:22-442:6).

According to PMG, another issue was Sathu's contention that Station 9538 could operate as a truck stop and service large trucks (*e.g.*, 18-wheelers). (*See* Stip. ¶¶ 61-72). At trial, Sathu, Deakin, and McGee agreed that Station 9538 could not operate as a truck stop. Sathu testified that Station 9538 could "easily fit midsize trucks, landscaping trucks, school buses . . ." (T. 381:25-382:5) but she never envisioned 18-wheelers because "they can't even fit in the canopy," (*id.* at 382:6-8). In any event, the testimony at trial indicated that the acreage of Station 9538 and its overhanging canopy could not physically accommodate a truck stop for 18-wheelers. (*See, e.g.*, T. 151:20-152:15, T. 330:10-333:16; *see also* Joint Exs. 12, 12A).

Sathu had complained the volume flow from the diesel pump was extremely slow and truck drivers often complained about the amount of time required to refill.

**PROPOSED RENEWAL OF THE FRANCHISE AGREEMENT**

The Dealer Lease and Supply Agreement was set to expire on September 30, 2016 – approximately eighteen months after Four S Shell assumed it would. (Stip. ¶ 106, Joint Ex. 1). In or around April 2016 – roughly six months before the expiration – McGee hand-delivered to Sathu a copy of the proposed Dealer Lease and Supply Agreement for the renewal of the franchise from October 1, 2016 through September 30, 2019 (hereinafter, the "Renewal"). (*Id.* ¶ 107; T. 290:5-8; Joint Ex. 13).

When McGee hand-delivered the Renewal to Sathu, McGee explained that the rent proposed "is going to be a huge jump from where you are" and "also said there's a possibility we

13

could turn this into a commission agent structure, if we want to go that route; that decision is kind of up to you." (T. 335:12-22, T. 243:9-18).  The Renewal sought to increase the rent from $5,466.65 to $10,000 per month for the initial year; $11,667.00 for the second year; and $12,000 for the third year.  (Joint Ex. 13, ¶ 3(a)).

Sathu did not follow up with McGee or PMG after that April meeting.  As such, PMG served Four S Shell with a written notice of termination on or about June 24, 2016, indicating that the franchise between Four S Shell and PMG would not be renewed and would terminate upon the expiration of the existing Dealer Lease and Supply Agreement in September 2016.  (T. 244:16-24, T. 270:2-9, T. 294:24-295:1, T. 335:24-336:2, T. 447:4-12; *see also* Stip. ¶ 130).

On August 12, 2016, Sathu emailed McGee to inquire how PMG calculated the proposed rent in the Renewal and noted that she "never expected such an aggressive increase in rent within such a condensed time period." (Joint Ex. 53, PMG003009).  McGee responded to Sathu's August 12, 2016 email:

> PMG uses its own propriety internal method to determine value for its properties.  PMG uses a multitude of commercially reasonable factors in determining rental values.  PMG's method is done in good faith, ordinary course of business, and in compliance with its internal rental valuation method.  PMG's approach for its rental valuation method is fair, consistent and are applied uniformly to all sites in its network.

(*Id.*, PMG003010).

At trial, McGee testified that Sathu should have known that the rent was going to increase at the end of the initial franchise term.  According to McGee, Sathu "understood that the rent was going to be reevaluated in a year and a half and that the rent might be substantially greater." (Stip. ¶ 39; *see also* T. 277:24-278:11).  In addition, during their initial skype meeting, Deakin allegedly advised Sathu that "the current rent that she was taking over on assignment was

14

substantially undervaluing the fair market value for the property." (T. 68:19-69:5). Deakin alleges that he explained to Sathu that rental amounts are based on twelve percent of the "estimated value of land, improvements, plus taxes and plus maintenance." (T. 145:16-146:9). Deakin, by way of example, advised Sathu that the amount of monthly rent would increase substantially if Station 9538 were, hypothetically, valued at $1 million or more. (*Id.*). Applying PMG's guideline rent formula of a twelve percent return on fair market value to a hypothetical fair market value of $1 million, Deakin explained to Sathu that the annual rent of $120,000 plus $23,000 in taxes and $25,000 in maintenance costs would yield a monthly rental charge of approximately $14,000 to $16,000. (T. 146:10-147:9).

At trial, Sathu contradicted Deakin's testimony, testifying that she was 'shocked" and was not expecting such a substantial increase in rent. (T. 431:18-432:3, T. 491:4-1). At most, she expected the rent to increase approximately ten to fifteen percent. (T. 393:19-23).

### METHOD TO APPRAISE STATION 9538

Deakin was the PMG employee who calculated the proposed rent in the Renewal. (T. 71:6-82:7, T. 263:5-10, T. 271:14-272:7). Deakin testified that he calculates annual rent at an amount commensurate to twelve percent of the "estimated value of the land, improvements, and equipment," plus taxes and maintenance. (T. 237:21-25; Stip. ¶ 55). He then divides that annual rent amount by twelve to yield the corresponding monthly rent. (*See id.*).

According to Deakin, in 2016, PMG was in the process of "transitioning all of [its] sites to . . . fair market value rent," or "12 percent of the estimated value of the land, improvements, and equipment." (T. 171:6-10). Deakin's goal was to "get a facility to what we would consider a reasonable return on our assets." (T. 102:14-18). In this case, Deakin determined that, "for

rental purposes," the fair market value of the Station was between $1.5 and $2 million.  (T. 77:23-78:3).

Deakin arrived at that valuation of Station 9538 by considering "all the information that[ was] available to [him] to try and determine [the] estimated value of [the] property."  (T. 71:6-14).  That information included: (i) an appraisal of the Property performed by Cushman & Wakefield, Inc.; (ii) a Letter of Intent from the Goldstein Group to lease Station 9538 to a tenant who would operate a Tim Horton's fast food restaurant; and (iii) personal knowledge of the property "up the road" at a "Starbucks location," as well as his general business knowledge of property values in New Jersey at the time.  (T. 77:23-78:3, T. 87:20-90:24; Stip. ¶¶ 115-123).

First, Deakin considered a Letter of Interest from the Goldstein Group (a commercial brokerage) on behalf of a prospective tenant seeking to lease Station 9538 to operate a Tim Horton's restaurant.  (Stip. ¶¶ 115-116).  The proposed annual rent was $120,000 for the first five contract years, or $10,000 per month, plus taxes and maintenance.  (*Id.*; Joint Ex. 14; *see also* T. 71:16-18, T. 79:8-17).  Although PMG received the letter of interest, no lease transaction was ever consummated.

Second, Deakin considered an appraisal report prepared by Cushman and Wakefield, dated September 22, 2015.  (Joint Ex. 15; T. 131:1-133:2).  According to Deakin, the appraisal report was prepared at the behest of M&T Bank, not PMG.  (T. 132:24-133:25).  The appraisal report concluded that Station 9538 had a value of $2,355,000, based exclusively on the Tim Horton's proposal as to the proposed rent.  (Joint Ex. 15 at 2).

Third, in forming an opinion of fair market value, Deakin considered his knowledge of PMG's recent sales of other properties located nearby and throughout New Jersey, which included a site "right up the road" from Station 9538 that was sold or leased to Starbucks.  (*See*

T. 71:20-72:1, T. 78:5-10, T. 90:13-24).  No documentation corroborating the Starbucks transaction was presented at trial.

Lastly, Deakin was familiar with the value of Station 9538 by virtue of his prior employment with Shell Oil.  (Stip. ¶ 124).  Specifically, Deakin was employed by Shell at the time that Shell sold Station 9538 to PMG in 2011.  (*Id.*).  He testified that Shell valued Station 9538 at approximately $1.5 to $2 million in "maybe 2011 to 2012."  (T. 66:6-16).  However, no such appraisal or other documentation was produced at trial to corroborate Deakin's testimony.

After considering all of the above, and based upon Deakin's general knowledge of real estate values in the area, Deakin concluded that the value of Station 9538 was between $1.5 and $2 million.  (T. 77:23-78:3).  If he had adopted the higher valuation of $2 million, Sathu's rent would have increased from $5,466.67 to approximately $27,000.  (T. 90:25-92:5).

Sathu never challenged Deakin's valuation of the Station at that time by providing a competing appraisal.  (T. 195:15-196:7, T. 325:7-15).

Deakin also testified that while it was PMG's "goal" to collect rent in accordance with its guideline rent formula, (T. 65:24-66:5, T. 71:6-18), he acknowledged that it may not always be commercially reasonable to collect such an amount, particularly where, as here, it would require a substantial increase from the existing rent to reach the twelve percent mark.  (T. 75:18-76:9, T. 90:25-94:1).  In other words, Deakin considered whether the rent should be "dampened" to mitigate the difference in the rent as determined by the guideline rent formula from the property's current rent.  (T. 101:16-102:18, T. 127:1-23).

Accordingly, in calculating the renewal amount, Deakin considered Four S Shell's current monthly rent of $5,466.67 against the guideline rent amount, and "dampened" it down to the proposed the new rent of $10,000 with an eye toward gradually increasing the rent to move

toward the guideline rent formula. (T. 76:10-25, T. 90:25-94:1, T. 127:1-23). During trial, the central issue was how Deakin determined the fair market value of Station 9538.

Notably, although there may have been a verbal conversation with Sathu regarding increased rent when the Dealer Lease and Supply Agreement was assigned to Four S Shell, PMG did not provide any written notification of the rent guideline formula to Sathu. Such notice would have provided Sathu with a reasonable expectation of a potential rent increase at the end of her franchise term. In fact, about a year after Four S Shell's termination, PMG memorialized its rent guidelines in a policy effective June 1, 2017. (Joint Ex. 23).[5] That policy provides, in pertinent part:

> Fair market value rent ('FMV Rent') is the most PMG may annually charge a lessee dealer for rent, except as expressly stated herein. Annual FMV Rent is calculated by multiplying the total estimated property value (including Land, Equipment, and Improvements) by 12%, and adding the Real Property Tax charge and adding $25,000.00 Annual Maintenance Charge. The estimated property value is established by PMG personnel based on all information available the time of the renewal and will be based on all the land PMG owns or leases associated with the property. The estimated property value will be based on the highest and best use of the land, regardless of current use or the nature of the underlying estate. The estimated property value will also assume that there are no conditions of property, subsoil or structures that are hidden or not apparent that render it more or less valuable. The property tax charge is based on the annualized tax most recently paid by PMG for the service station, real estate, and improvements. The Annual Maintenance Charge will be an annual maintenance cost to cover PMG's maintenance responsibilities ('Annual Maintenance Charge').

---

[5] The Court's focus was to determine PMG's mindset at the time of renewal to determine if it was acting in good faith. To avoid relying on hindsight, the Court gave little weight to post-termination evidence such as other proposed leases and an appraisal submitted by Four S Shell.

(*Id.* at 1).  While the rent guideline formula did not exist in written form during the termination or non-renewal of Four S Shell's agreement, PMG contends that the guidelines were the usual methodology or practice in the "years prior" to publication of the guidelines.  (T. 135:7-12).

### TERMINATION OF THE DEALER LEASE AND SUPPLY AGREEMENT

As set forth above, in late June 2016, McGee hand delivered to Sathu written notice of termination of the Dealer Lease and Supply Agreement.  Later, in September 2016, Sathu requested information about becoming a commission agent rather than a dealer/franchisee.[6]  (T. 252:10-253:12, T. 292:9-295:21; *see also* Joint Ex. 121).  But, according to McGee, PMG denied Sathu's request because Four S Shell's agreement had already been terminated.  (*See id.*).  At the time of Sathu's inquiry, PMG had no successor or commission agent ready or in place to operate Station 9538.  (*See id.*).

The Dealer Lease and Supply Agreement's termination became effective on September 30, 2016.  After such expiration, PMG held in its possession Four S Shell's funds in the amount of $43,287.36 (consisting of $3,863.72 of fuel inventory, a $25,000 security deposit, and $14,423.64 in various receivables) which should have been returned to Four S Shell following the termination of the franchise and its vacation of the property.  (Stip. ¶ 141; *see also* T. 197:11-200:8).  However, in light of the pending litigation and the Court's decision in PMG's favor at the October 2016 preliminary injunction hearing, PMG retained possession of these funds.  (Stip. ¶ 142).  PMG advised Four S Shell that PMG was retaining the funds until litigation concluded, minus deductions for repair costs that had not yet been billed and, if appropriate, costs and attorneys' fees pursuant to the franchise agreement.

---

[6] The commission agent structure bears less risk than a dealer because a commission agent does not have to purchase his or her own fuel or determine a price at which they could sell same for a profit.  (*Id.* at 273:18-274:19).  If Sathu agreed to become a commission agent, the rent would have been reduced from what was included in the Renewal. (*Id.* at 243:25-244:3).

CONCLUSIONS OF LAW

**LEGISLATIVE HISTORY OF PMPA**

"The PMPA regulates the relationship between franchisors, motor fuel refiners and distributors, and their franchisees, principally retail gas station operators." *Patel v. Sun Co.*, 141 F. 3d 447, 451 (3d Cir. 1998). "In 1978, after examining this [franchisee-franchisor] relationship and determining that legislative protection for franchisees was necessary, Congress enacted the PMPA." *Patel*, 141 F. 3d at 451. PMPA, in large part, aimed to address the concern that franchisors had been using their superior bargaining power to gain an unfair advantage in contract disputes. *See Slatky v. Amoco Oil Co.*, 830 F.2d 476, 478 (3d Cir. 1987) (citing S. Rep. No. 731, 95th Cong., 2d Sess. 17-19, *reprinted in* 1978 U.S. Code Cong. & Ad. News 873, 875-77 (hereinafter, the "Senate Report")); *Munno v. Amoco Oil Co.*, 488 F. Supp. 1114, 1118 (D. Conn. 1980). "In addition, Congress wanted to protect franchisees from 'arbitrary or discriminatory terminations and non-renewals.'" *Patel*, 141 F.3d at 451 (citing Senate Report 18).

To that end, the Third Circuit has noted that when Congress passed PMPA:

> Congress determined that franchisees had a 'reasonable expectation []' that 'the [franchise] relationship will be a continuing one.' The PMPA's goal is to protect a franchisee's 'reasonable expectation' of continuing the franchise relationship while at the same time insuring that distributors have 'adequate flexibility . . . to respond to changing market conditions and consumer preferences.'

*Id.* (alterations in original) (citing *Slatky*, 830 F.2d at 478); *see also Anand v. BP W. Coast Prods. LLC*, 484 F. Supp. 2d 1086, 1093 (C.D. Cal. 2007). For these reasons, the PMPA "limits the circumstances in which petroleum franchisors may 'terminate' a franchise or 'fail to renew' a

franchise relationship." *Mac's Shell Serv., Inc. v. Shell Oil Prods. Co.*, 559 U.S. 175, 177 (2010) (quoting 15 U.S.C. § 2802).

The PMPA provides, in pertinent part, that a franchisor (*i.e.*, PMG) "may terminate any franchise . . . or may fail to renew any franchise relationship" if the franchisee (*i.e.*, Four S Shell) fails to agree to changes or additions to the provisions of a franchise agreement.  15 U.S.C. §§ 2802(b)(1), (b)(3).  However, under the statute, the franchisee's refusal to agree constitutes permissible grounds for termination or nonrenewal only: (i) where the proposed changes or additions are "the result of determinations made by the franchisor in good faith and in the normal course of business"; and (ii) where the franchisor has not insisted upon the changes or additions "for the purpose of converting the leased marketing premises to operation by employees or agents of the franchisor for the benefit of the franchisor or otherwise preventing the renewal of the franchise relationship."  *Id.* § 2802(b)(3)(A)(i)-(ii).

## PERTINENT LEGAL STANDARDS

Here, the Court must undertake a two-pronged analysis to determine whether PMG has met its burden of demonstrating that its actions were: (i) made in good faith; and (ii) made in the normal course of business.  *Duff*, 51 F.3d at 744.  "[A]lthough these two inquiries are usually stated separately, they are usually intermingled.  Deviation from the normal course of doing business is, of course, highly relevant and probative evidence on the issue of good faith."  *Id.*

With respect to the first prong of the analysis, "an examination of whether the franchisor acted in good faith is necessarily a subjective test."  *Id.*; *see also Munno*, 488 F. Supp. at 1121; *Van Diest v. Conoco, Inc.*, 851 F. Supp. 1415, 1418 (D. Neb. 1994).  "'Good faith' has been uniformly interpreted as meaning subjective good faith, that is, an honest evaluation of the franchisor's own business needs, and in applying that standard courts are not entitled to second-

21

guess franchisor's economic decisions." *Vasco v. Mobil Oil Corp.*, 698 F. Supp. 102, 104 (D.

Md. 1988) (collecting cases); *see also Svela v. Union Oil Co. of Cal.*, 807 F.2d 1494, 1501 (9th

Cir. 1987).

Where, as here, the defendant relies on grounds for nonrenewal enumerated under §

2802(b)(3)(A) of PMPA, courts have

> sought to inquire into "good faith" without engaging in judicial
> second-guessing of the economic impact of an otherwise legitimate
> business decision by the franchisor.  So long as the franchisor does
> not have a discriminatory motive or use the altered terms [of the
> franchise agreement] as a pretext to avoid renewal, the franchisor
> has met the burden required by the PMPA for determining good
> faith.

*Unocal Corp. v. Kaabipour*, 177 F.3d 755, 767 (9th Cir. 1999) (citation and quotation marks

omitted); *see also BP W. Coast Prods. LLC v. May*, 347 F. Supp. 2d 898, 903 (D. Nev. 2004),

*aff'd,* 447 F.3d 658 (9th Cir. 2006) (citation omitted); *see also Beck Oil Co. v. Texaco Refin. &*

*Mktg., Inc.*, 25 F.3d 559, 562 (7th Cir. 1994).  Ordinarily,

> [a] mere increase in rent, even where it may seem objectively
> unreasonable and/or where a franchisee may not be able to pay the
> higher rent being charged under a new franchise agreement, is not
> relevant to good faith so long as a rent formula is applied in a non-
> discriminatory manner to all of the applicable franchisees.

*Equilon*, 163 F. Supp. 2d at 1177 (citing *Duff*, 51 F.3d at 744-45; *Esso Standard Oil Co. v. Dep't*

*of Consumer Affairs*, 793 F.2d 431, 432 (1st Cir. 1986)); *see also Chestnut Hill Gulf, Inc. v.*

*Cumberland Farms, Inc.*, 788 F. Supp. 616, 621 (D. Mass. 1992); *Pearman v. Texaco, Inc.*, 480

F. Supp. 767, 768 (W.D. Mo. 1979); *Palmieri v. Mobil Oil Corp.*, 529 F. Supp. 506, 512 (D.

Conn.), *aff'd,* 682 F.2d 295 (2d Cir. 1982); *Bellmore v. Mobil Oil Corp.*, 524 F. Supp. 850, 853-

54 (D. Conn. 1981)).  As the First Circuit noted in *Esso*:

> Because the "good faith" requirement requires merely that a
> franchisor not act "with evil motive or discriminate[ ] selectively

> against franchisees" . . . courts have upheld franchisor demands
> for rent increases ranging from 100% to 300% when those
> demands were made in accord with established rental formulas
> applied to all franchisees and not for the purpose of selectively
> terminating a particular franchisee.

*Esso*, 793 F.2d at 432 (citations omitted).

Indeed, the PMPA does not provide franchisees a cause of action where even "radical increases in rent appear[ ] objectively or commercially reasonable." *Id.* (collecting cases). "Accordingly, the PMPA does not give this Court authority to review the objective reasonableness of the terms of the new franchise agreement[ ], or to substitute its judgment for that of [PMG] in development or promulgation of the new agreement[ ] to [Four S Shell]." *Equilon*, 163 F. Supp. 2d at 1175.

The second prong of the analysis – whether the rent decision was made in the normal course of business – "requires an examination of the franchisor's normal decision-making process." *Duff*, 51 F.3d at 744; *see also* Senate Report 896. That is, "[w]hile Congress intended the good faith test to prevent franchisors from shielding their decisions with artifice, the normal course of business element examines whether the franchisor made the choice through its usual decision-making process." *Sandlin v. Texaco Refin. & Mktg. Inc.*, 900 F.2d 1479, 1481 (10th Cir. 1990). Accordingly, a franchisor-defendant will meet its burden of proof with respect to this prong if it can establish that the proposed changes to the franchise relationship were the result of its "normal decision-making process." *Id.*; *see also Equilon*, 163 F. Supp. 2d at 1175.

With these precepts in mind, the Court will now apply the law to the facts adduced at trial. As explained *supra*, "[u]nder the PMPA, the franchisee has the initial burden of proving that his franchise was not renewed. The burden then shifts to the franchisor to demonstrate that the non-renewal was proper under the PMPA." *Anand*, 484 F. Supp. 2d at 1094 (citation

omitted). Here, there is no dispute that Four S Shell met its initial burden of proving that its franchise was not renewed. Station 9538, as a distressed station, could not viably operate with such a large rent increase. As stated by Plaintiff's counsel at trial, the sole "issue in this case is whether the [PMPA] was violated by the defendant [PMG] in . . . failing to provide in good faith a renewal lease for the plaintiff, Four S Shell." (T. 4:6-10; *see also* Pl. Post-T. Br. at 2, ECF No. 99). Thus, the Court is tasked with determining, in light of the facts adduced at trial, whether PMG met its burden of demonstrating, beyond a preponderance of the evidence, that its Renewal was offered in good faith, in the normal course of business, and not for the purpose of converting Station 9538 to company operations or preventing renewal. 15 U.S.C. §§ 2802(b)(3)(A)(i)-(ii); *See Equilon*, 163 F. Supp. 2d at 1176. For the reasons that follow, the Court finds that PMG has not met its burden.

## A. ACTS THAT DEMONSTRATE THAT PMG WAS NOT ACTING IN GOOD FAITH OR IN THE NORMAL COURSE OF BUSINESS

There are several facts and instances which demonstrate that PMG did not meet its burden to demonstrate that the Renewal was proposed in good faith and in the normal course of business. The Court principally relies on paragraphs 1 (a - e) below to support its decision, followed by several ancillary conclusions:

(1)    Deakin's conclusion that Station 9538 had a value of between $1.5 to $2 million is suspect and constitutes an act of bad faith for the following reasons:

a.    Deakin relied on a letter of interest from the Goldstein Group who had a client who wished to lease Station 9538 to operate a Tim Horton's restaurant. That offer included rent of $10,000 per month plus taxes and maintenance. *See supra* at p. 15. Deakin's reliance on the letter of interest was not a sound premise for his valuation of Station 9538. First, Deakin received the letter of interest in May

24

2015, but no lease was consummated in April 2016.  In light of the fact that no lease was ever signed, one cannot logically rely on the letter of interest as a determinative factor as to the fair market value.  This is an arbitrary act.

b.  Deakin's reliance on the appraisal of Cushman and Wakefield dated September 22, 2015 (Joint Ex. 15) was a significant error.  The appraisal, valuing the Station's property at $2,355,000, clearly states that it is based exclusively on the Tim Horton's letter of interest.  (*See id.*).  As such, the appraisal assumes that a lease for a Tim Horton's restaurant would be consummated.  Here, at the time of the renewal, there was no lease with a Tim Horton's restaurant in place, and, as such, reliance on the appraisal which assumed otherwise was misplaced – another act demonstrating a lack of good faith.

c.  Deakin testified that his valuation of Station 9538 was based on his knowledge of the value of real estate in the area, including a Starbucks developed "up the road," but Deakin provided no documentation to support his Starbucks comparison.  (*See* T. 71:20-72:1, T. 78:5-10, T. 90:13-24).  There was no evidence of an appraisal of the Starbucks or any characteristics (*i.e.*, lot size) of the Starbucks.  Without documentation, the Starbucks comparison is suspect and arbitrary.

d.  Deakin noted that when he was employed by Shell in 2011, he recalled an appraisal of Station 9538 of about $1.5 to $2 million.  (*Id.* at 66:6-16).  Like his faulty Starbucks comparison described above, there was no evidence admitted at trial to support his memory of such an appraisal.  In any event, his reliance on such an appraisal, if there was one, demonstrates his lack of thoughtfulness in his decision-making process.  To rely on an alleged Shell appraisal, one should have

25

obtained a copy of same and reviewed it against present conditions.  For example, prior to the purchase of Station 9538 by PMG, the Station was prosperous, selling approximately 200,000 gallons of gasoline per month, but after PMG leased it to Chaudhary, it became a "distressed station."  (Stip. ¶¶ 12, 13).  The Station's plummeting value due to Chaudhary's disastrous management could have affected the Station's appraisal value.  Similarly, the Shell appraisal was approximately four to five years old and, as such, was likely outdated in other respects.  Therefore, reliance on the Shell appraisal was an arbitrary act that suggests bad faith.

e.   Deakin's imposition of the "dampened down" guideline rent formula was inconsistent with the history of Station 9538.  Deakin testified that he sought to collect rent from all stations using the guideline rent formula, and he was attempting to obtain same from Station 9538.  (T. 171:6-10).  To the contrary, however, when PMG leased Station 9538 to Singh, McGee testified that the guideline rent formula was "not relevant" because Station 9538 was distressed.  (T. 240:9-25).  As such, the imposition of the "dampened down" guideline rent formula is not consistent with the prior dealers' arrangements.  To apply the guideline rent formula (even if it was "dampened") was an arbitrary act compared to prior dealers.  The best method to assess the value of land is to hire an appraiser.  Doing so would have posed a minimal cost to PMG and would have prevented reliance on the off-the-cuff deductions by Deakin.  It would have prevented arbitrary actions.

(2)     The franchise relationship between Four S Shell and PMG was enumerated in the Dealer Lease and Supply Agreement.  The Agreement sets forth the obligations of both parties with respect to their franchisor-franchisee relationship.  The Agreement contains no provision, reference, or notice of PMG's purported reliance on its guideline rent formula or how it determines fair market value with respect to renewals.

Without question, fair notice of a potential increase of rent based on the guideline rent formula should have been provided to Four S Shell in writing.  Although McGee and Deakin allegedly orally advised Sathu that such an increase could occur, Sathu denies any such conversation.  Since Sathu had no prior experience operating a gas station, she most likely had no knowledge of the guideline rent formula.  In any event, rent increases are an essential term of the dealer/distributor relationship, and an oral discussion is insufficient to meet PMG's good faith duty owed to Four S Shell.  Due to a lack of written advance notice of the guideline rent formula, the Court finds that the rent increase indicates PMG's lack of good faith.

(3)     The Dealer Lease and Supply Agreement provides many conditions under which PMG reserves the right to terminate the dealer.  These conditions include a conviction of a felony, failing to work diligently, abandonment of the premises, etc.  (*See* Agreement summary *supra* at pp. 10-11).  In this case, Four S Shell did not breach any of those conditions, and Four S Shell successfully completed an on-site performance review under Shell's Mystery Motorist Program.  Since Deakin and McGee did not testify about Four S Shell's compliance with the Agreement terms and the Mystery Motorist Program, it was likely not a determinative factor in whether to renew Four S Shell's operation.  This omission shows a lack of good faith.

(4)     Under the Dealer Lease and Supply Agreement, there is a provision that Four S Shell's employees must participate in training courses and seminars about best practices to

operate a station efficiently. (Joint Ex. 1, ¶ 13). It is inferred in the training provision that PMG will conduct the training. (*See id.*). PMG never provided any training seminars to Sathu or any other Four S Shell employee. Considering that Sathu had no experience in gas station operations, it would have been prudent to provide same. For example, the training could have covered timely payments for gasoline and how to prevent interruptions of service. Not providing any training, even though PMG was aware of Sathu's inexperience, demonstrates PMG's lack of good faith.

In conclusion, based on the facts and law discussed above, PMG acted in bad faith in violation of PMPA. Thus, the Court finds in favor of Four S Shell and against PMG.

DAMAGES

In a PMPA case, "successful franchisees can benefit from a wide range of remedies, including compensatory damages, reasonable attorney's fees and expert costs, and equitable relief." *Mac's Shell Service*, 559 U.S. at 179 (citing 15 U.S.C. § 2805(b), (d)).

In this case, Four S Shell seeks the following damages: (i) the $43,287.36 (consisting of $3,863.72 of fuel inventory, a $25,000 security deposit, and $14,423.64 in various receivables) of its funds withheld by PMG; (ii) $3,600 for the installation of bullet-proof glass at the Station; (iii) the $130,000 goodwill payment made by Four S Shell to AA Shell for the assignment of the Dealer Lease and Supply Agreement; and (iv) attorneys' fees. (Pl. Post-T. Br. at 15-20).

For the reasons that follow, the Court will award the following damages: (i) the $43,287.36 in withheld funds; (ii) $3,600 for the installation of bulletproof glass at the Station; and (iii) Four S Shell may file an application for attorneys' fees within thirty days of this Memorandum.

First, the parties have stipulated that PMG has in its possession $43,287.36 (consisting of $3,863.72 of fuel inventory, a $25,000 security deposit, and $14,423.64 in various receivables) of Four S Shell's funds. (*See, e.g.*, Stip. ¶¶ 141-143). The funds were purportedly withheld by PMG due to Four S Shell filing the instant lawsuit. (*Id.*). Although there may have been a different finding by a magistrate judge, as far as the Court can determine from hearing the evidence, there is no reason why PMG should continue to hold these funds. PMG does not dispute that these funds are owed to Four Shell, and it offers no compelling reason why PMG should not return them. Indeed, PMG's only explanation as to why it should not be obligated to reimburse Four S Shell the $43,287.36 at the present time is because the funds are purportedly not "part of this case." (PMG Post-T. Br. at 53-56). The Court disagrees. The trial testimony adduced that the $43,287.36 is related to the PMPA claim and issues in this action. As such, Four S Shell is awarded $43,287.36, which was stipulated to represent $3,863.72 of fuel inventory, a $25,000 security deposit, and $14,423.64 in various receivables.

Second, in its post-trial briefing, Four S Shell asks the Court to award it $3,600 for its installation of bulletproof glass at the Station. At trial, McGee testified that Sathu installed bulletproof glass, which she was not required to do in order to comply with the maintenance and repair rider annexed to the Dealer Lease and Supply Agreement. (T. 334:17-335:2). McGee testified that installing the bulletproof glass was an improvement on the property. (*Id.*). Sathu testified that the cost of the installation of the bulletproof glass was approximately $3,500. (T. 392:9-23; T. 451:5-7; T. 519:25-520:10). In its post-trial briefing, Four S Shell clarified that the cost of the glass was $3,600. (Pl. Post-T. Br. at 17). Neither amount was disputed at trial. (*See, e.g.*, T. 519:25-520:10). Thus, the Court shall award Four S Shell $3,600 in damages to reimburse Sathu for expenses she paid to increase the value of PMG's property.

Third, Four S Shell will be permitted to file an application for attorneys' fees.  Under the PMPA, a franchisee that prevails on her claim under the statute is entitled to seek reasonable attorneys' fees.  *Mac's Shell Service*, 559 U.S. at 179 (citing 15 U.S.C. § 2805(b), (d)).  Since Four S Shell prevailed, it shall have thirty days from the date of this Memorandum to file an application for reasonable attorneys' fees.

The Court will not award damages to Four S Shell in the amount of $130,000 it paid to AA Shell (Arvelo) for assignment of the Dealer Lease and Supply Agreement.  The evidence at trial does not support same.  For instance, Sathu knew Arvelo was seeking to assign his interest because he was not making sufficient money.  In addition, McGee told Sathu it was a "tough location," and Deakin advised her that it was unrealistic to expect to make $130,000.  All in all, Sathu paid far more than the reasonable value for the assignment of the Dealer Lease and Supply Agreement.  More importantly, Plaintiff did not cite any case that permits return of acquisition costs as a measure of damages.  Curiously, Four S Shell does not seek lost profits or other similar compensatory damages.  No evidence of same was presented at trial, nor was it requested in Four S Shell's pre- and post-trial briefing. As such, lost profits are not awarded.

An appropriate Judgment shall be entered.


9/14/20

_____
PETER G. SHERIDAN, U.S.D.J.


30